THEODORE J. SAWICKI (*Pro Hac Vice Application To Be Submitted*)
tod.sawicki@alston.com
TODD F. CHATHAM (*Pro Hac Vice Application To Be Submitted*)
todd.chatham@alston.com
**ALSTON & BIRD, LLP**
1201 West Peachtree Street
Atlanta, GA 30309
Telephone:   (404) 881-7000
Facsimile:    (404) 881-7777

MICHAEL J. HARTLEY (State Bar No. 189375)
michael.hartley@alston.com
**ALSTON & BIRD, LLP**
333 South Hope Street
Sixteenth Floor
Los Angeles, California 90071
Telephone:   (213) 576-1000
Facsimile:    (213) 576-1100

Attorneys for Plaintiff
ROYAL ALLIANCE ASSOCIATES, INC.

FILED
CLERK U.S. DISTRICT COURT

APR 1 2 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

SACV11-00563 AG(MLGx)

| | |
|---|---|
| ROYAL ALLIANCE ASSOCIATES, INC., | Case No.: |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | |
| ERIC ANDERSON, | |
| Defendant. | |

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Plaintiff ROYAL ALLIANCE ASSOCIATES, INC. ("Royal Alliance"), by and through its counsel, respectfully submits this Complaint for Declaratory and Injunctive Relief against Defendant ERIC ANDERSON ("Defendant"), pursuant to 28 U.S.C. § 2201 and Fed. R. Civ. P. 57 and 65.   Diversity jurisdiction is appropriate pursuant to 28 U.S.C. § 1332.   There is complete diversity of citizenship between Royal Alliance and the Defendant.   Royal Alliance is a Delaware corporation and has its principal place of business in New York.   Defendant, on information and belief, is a citizen and resident of California.   The amount in controversy exceeds $75,000 because this action involves underlying arbitration claims in which the Defendant seeks at least $550,000 in damages against Royal Alliance.   Royal Alliance alleges as follows:

## NATURE OF THE ACTION

2.     This action seeks a declaration that Royal Alliance cannot be compelled to arbitrate any claims that have been asserted by the Defendant against Royal Alliance before a FINRA Dispute Resolution arbitration panel (the "Arbitration"), or any other arbitration panel, because there is no arbitration agreement between the parties.   The Defendant has never been a customer of Royal Alliance, has never held any investments with, or made any investments recommended by, Royal Alliance, and there are no written agreements whatsoever between Royal Alliance and the Defendant.

3.     The Defendant nevertheless has filed a FINRA arbitration claim against Royal Alliance, alleging breach of fiduciary duty, negligent failure to supervise, professional   negligence,   unjust   enrichment,   negligent   and   intentional misrepresentation, unfair business practices, and state law securities violations.

4.     The Defendant's claims in the Arbitration arise out of his January 2007 investment in certain notes issued by Medical Capital Holdings, Inc. ("MCH"), its subsidiaries or affiliates (collectively referred to as "Medical Capital"), purportedly on the recommendation of Robert John Clark, a broker registered with another separate

1

1   brokerage firm, United Securities Alliance, Inc. ("United Securities"), at the time of

2   the transaction at issue and alleged wrongdoing.

3        5.    The United Securities' broker who serviced the Defendant's account(s)

4   has <u>never</u> been registered or otherwise affiliated with Royal Alliance.

5        6.    The Defendant apparently contends in the Arbitration that Royal Alliance

6   nevertheless is liable to him and required to arbitrate his claims against Royal Alliance

7   on the theory that Royal Alliance is the successor-in-interest to United Securities and

8   that the United Securities' broker who serviced the Defendant's account(s) somehow

9   became an agent of Royal Alliance.  This is not the case.

10        7.    Although Royal Alliance purchased certain assets from United Securities

11   in an asset purchase transaction that closed on March 1, 2007:

- Royal Alliance did not merge with United Securities;

- Royal Alliance expressly did not assume any liabilities of United Securities;

- Royal Alliance did not assume United Securities' customer relationship with the Defendant;

- The United Securities' broker who serviced the Defendant's account(s) was not affiliated with Royal Alliance at the time relevant to Defendant's claims, nor has he <u>ever</u> been affiliated with Royal Alliance;

- Royal Alliance does not have, and never has had, any ownership interest in United Securities;

- None of the owners of United Securities acquired any direct or indirect ownership interest in Royal Alliance as a result of the asset purchase transaction between Royal Alliance and United Securities; and

- United Securities still exists and operates in furtherance of its own profits.

27        8.    This Court's intervention, in the form of declaratory and injunctive relief,

28   is necessary to save Royal Alliance from incurring irreparable harm by being forced to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  defend in arbitration claims that it never agreed to arbitrate.  Such relief would not be
2  unduly prejudicial to the Defendant because this court will not be make a liability
3  decision and because the Defendant's possible remedies against others would remain
4  unaltered, should he choose to pursue such a course of action.

5                                    **THE PARTIES**

6          9.      Royal Alliance is a corporation organized and existing under the laws of
7  the State of Delaware and has its principal place of business in New York, New York.
8  Royal Alliance is a registered securities broker-dealer and is a member of the
9  Financial Industry Regulatory Authority ("FINRA").

10         10.     On information and belief, Defendant Eric Anderson is a citizen and
11  resident of California.

12                          **JURISDICTION AND VENUE**

13         11.     This is an action brought pursuant to 28 U.S.C. § 2201 for declaratory
14  relief and to obtain a preliminary and permanent injunction concerning the Arbitration
15  pending in Los Angeles, California.

16         12.     Diversity jurisdiction is appropriate pursuant to 28 U.S.C. § 1332.  There
17  is complete diversity of citizenship between Royal Alliance and the Defendant.  Royal
18  Alliance is a Delaware corporation and has its principal place of business in New
19  York.  Defendant, on information and belief, is a citizen and resident of California.

20         13.     The amount in controversy exceeds $75,000 because this action involves
21  underlying arbitration claims in which the Defendant seeks at least $550,000 in
22  damages against Royal Alliance.

23         14.     Personal jurisdiction over the Defendant is proper because the Defendant
24  has initiated the Arbitration within the state of California and, therefore, has
25  purposefully availed himself of the laws of California.

26         15.     Venue is proper in this District because the Defendant resides in this
27  District and because the Arbitration is pending in this District.

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**FACTUAL BACKGROUND**

16.   On February 15, 2011, Defendant Eric Anderson filed a "Statement of Claim" with FINRA Dispute Resolution, thus initiating the Arbitration.  *See* Statement of Claim, FINRA Dispute Resolution Arbitration Number 11-00678 at 1, attached hereto as Exhibit A.  The claim purportedly is filed against Royal Alliance regarding an investment that the Defendant made in certain notes issued by Medical Capital ("Medical Capital Notes"), based on advice from United Securities and its registered representative, Robert John Clark ("Clark").  *Id.* at 12-16.

17.   The Defendant has never been a customer with Royal Alliance.  Any statements or omissions made in connection with the investment at issue, as well as the actual purchase of the investment, resulted from the Defendant's business dealings with United Securities—either directly or through its agent and registered representative, Clark.

18.   In the Arbitration, the Defendant alleges that he was defrauded by Clark during the solicitation and recommendation of the investment at issue.  *Id.* at 2. According to the Defendant, Clark first approached him with the Medical Capital offering in 2006 and the Defendant ultimately invested in the Medical Capital Notes on approximately January 9, 2007.  *Id.* at 13, 16.

19.   Clark was employed by and registered with United Securities from March 2004 through March 2007.  *See* FINRA BrokerCheck Report for Robert John Clark ("FIRNA BrokerCheck Report") at 6, attached hereto as Exhibit B.  Therefore, as the Defendant himself admits, Clark "was ***at all relevant times*** a Financial Advisor offering securities and advisory services through his broker-dealer United Securities as its agent and Registered Representative." *See* Statement of Claim at 3-4 (emphasis added).

20.   The misrepresentations and omissions complained of in the Arbitration occurred prior to Royal Alliance's asset purchase agreement with United Securities, the brokerage firm allegedly responsible for the Defendant's losses.

4

21.   Royal Alliance closed its asset purchase transaction with United Securities on March 1, 2007.   Clark's FINRA registration as a United Securities' broker was not transferred to Royal Alliance as a result of this asset purchase transaction.   *See* FINRA BrokerCheck Report at 6   In fact, as FINRA's publicly accessible broker records clearly show, Clark has <u>never</u> been registered with Royal Alliance. *Id.*

22.   The Defendant alleges that Royal Alliance's obligation to arbitrate arises from Royal Alliance's purported status as successor-in-interest to United Securities' contractual relationship with the Defendant. *See* Statement of Claim at 4.

23.   The Defendant seeks to recover from Royal Alliance damages allegedly caused by United Securities and Clark.   The sole basis of the claims against Royal Alliance is that its 2007 asset purchase transaction with United Securities purportedly made it the successor-in-interest to United Securities and, therefore,  responsible for all of United Securities' liabilities, including those asserted in the Arbitration. *Id.* at 4. However, because Royal Alliance's transaction with United Securities was merely an asset purchase transaction for certain United Securities assets it did not cause Royal Alliance to assume successor liability for subsequent claims against United Securities. Therefore, the Defendant has no basis to compel Royal Alliance to arbitrate his claims against it.

24.   The Defendant has never been a customer with Royal Alliance, nor has he ever held any securities accounts or had any written agreements with Royal Alliance.  The Defendant does not allege otherwise in the Arbitration.

25.   The investment about which the Defendant complains in the Arbitration was purportedly made in January 2007, two months before Royal Alliance's asset purchase transaction with United Securities.

26.   The Defendant does not allege that the United Securities registered representative who advised him on his investment was ever registered or spoke on behalf of Royal Alliance.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

27. There is no express or implied contract or agreement between Royal Alliance and the Defendant. Therefore, there is no contractual mandatory arbitration provision between Royal Alliance and the Defendant.

28. Royal Alliance is not a party to any arbitration agreement between the Defendant and United Securities.

29. FINRA Code of Arbitration Procedure Rule 12200, entitled "Arbitration Under an Arbitration Agreement or the Rules of FINRA," provides in relevant part:

> Parties must arbitrate a dispute under the Code if:
>
> - Arbitration under the Code is either:
>   (1) Required by a written agreement, or
>   (2) Requested by the customer;
> - The dispute is *between a customer and a member or associated person of a member*; and
> - The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

FINRA Code of Arbitration Procedure for Customer Disputes Rule 12200 (emphasis added); *see also* former Rule 10301 (any dispute "between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons" must be resolved via arbitration, only if the parties have entered into an agreement that includes such an arbitration provision, or if the customer demands arbitration).

30. The Defendant therefore is not a "customer" of Royal Alliance within the meaning of the FINRA arbitration rule.

31. Royal Alliance is an independent securities broker-dealer firm that has never had any ownership interest in United Securities. The only connection between Royal Alliance and United Securities is the 2007 asset purchase transaction described

immediately below.  Royal Alliance had no affiliation with United Securities or Clark during the time period relevant to the Defendant's claims.

32.    In March 2007, Royal Alliance acquired certain assets of United Securities.  The terms of this asset purchase are set forth in the Rights and Information Transfer Agreement By and Among Royal Alliance Associates, Inc., United Securities Alliance, Inc., Ronald Bloomingkemper, Michael Jones, Ronald Petrinovich, Patrick Sutherland and US Alliance Holdings, Inc. ("Transfer Agreement"), attached hereto as Exhibit C.

33.    The Transfer Agreement expressly provides that it shall be governed by and construed in accordance with the laws of the state of New York, without regard to the conflicts of law principles thereof.  *See* Transfer Agreement, § 11.3.

34.    The Transfer Agreement expressly states that Royal Alliance purchased only specified assets from United Securities.  *See* Transfer Agreement, Recitals, B; *see also id.* § 2.1(a)(i)(A).

35.    Further, the Transfer Agreement contemplates that United Securities would continue in existence, *id.* § 6.11, and would remain responsible for "Retained Liabilities," including those at issue in the Arbitration.  *Id.* § 2.1(c).  The Transfer Agreement further expressly provides that Royal Alliance refuses to assume any of United Securities' liabilities.  *Id.*

36.    The Transfer Agreement further manifests Royal Alliance's intention to not assume litigation liabilities of United Securities by requiring that United Securities arrange for "errors and omissions tail insurance[, to] cover claims arising out of facts or circumstances relating to United Securities . . . prior to the Closing Date . . . ."  *Id.* § 6.13.  This insurance is intended to cover claims arising within at least six years of the Closing Date, *i.e.*, between March 1, 2007 and March 1, 2013.  *Id.*  The Transfer Agreement expressly states that United Securities is "responsible . . . for the payment of any and all premiums for such tail insurance . . . ."  *Id.*

37.    The Transfer Agreement also requires United Securities to indemnify

7

1   Royal Alliance for

2         "any liability, loss, cost, Tax, expense, judgment, order, settlement,

3         obligation, deficiency, claim, suit, proceeding (whether formal or

4         informal), investigation, lien or other damage, including, without

5         limitation, reasonable attorneys' fees and expenses . . . , resulting from,

6         arising out of or incurred with respect to . . . (b) any events occurring or

7         circumstances existing with respect to [United Securities] prior to the

8         Closing or any acts or omissions of [United Securities] occurring prior to

9         the Closing, including, without limitation, claims relating to the sales of

10        securities, prior to the Closing, . . . or (e) any Retained Liabilities [as

11        defined in § 2.1(c)]."

12  *Id.* § 9.2.   This provision further demonstrates that the parties to the Transfer

13  Agreement intended that United Securities would bear the referenced liabilities.

14      38.   United Securities remains an active Nevada corporation to this day and,

15  on information and belief, is in good standing.   *See* Certificate of Existence with

16  Status in Good Standing, attached hereto as Exhibit D.

17      39.   According to its most recent federal investment adviser filing, United

18  Securities continues to function independently and for profit as an investment adviser,

19  offering "financial planning[,] portfolio management[,]" and adviser selection

20  services.   *See* United Securities Alliance, Inc., Uniform Application for Investment

21  Adviser Registration ("Form ADV"), at 1, 8-9 (Nov. 5, 2010), attached hereto as

22  Exhibit E.

23      40.   On this Form ADV, United Securities certifies to the Securities and

24  Exchange Commission, under penalty of perjury, that it currently manages assets of

25  approximately $43,800,000.   *See* Form ADV at 3, 8, 70.   United Securities operates

26  autonomously and reports to the SEC that it is not "an investment adviser that

27  controls, is controlled by, or is under common control with, an investment adviser that

28  is registered with the SEC . . . ."   *Id.* at 3.   In addition, United Securities certifies that

8

its "principal office and place of business" is not the same as any other registered adviser. *Id.* It also affirmatively states that it is not "succeeding to the business of a registered investment adviser." *Id.* at 6.

41.     On the Form ADV, United Securities further identifies the states in which it plans to continue conducting business. *Id.* at 4. It also certifies that it has between eleven (11) and fifty (50) employees. *Id.* at 7. During its last fiscal year, United Securities provided investment advisory services to between two hundred fifty-one (251) and five hundred (500) clients, comprised of "individuals" and "high net worth individuals." *Id.* at 7-8. It provides financial planning services to between eleven (11) and twenty-five (25) clients. *Id.* at 9.

42.     United Securities is compensated by its clients by receiving a percentage fee based on the assets under management, by levying hourly charges and fixed fees, and by securing commissions. *Id.* at 8.

43.     The Form ADV states that United Securities' direct and indirect owners are:

- US Alliance Holdings, Inc.;
- Michael Washington Jones;
- Ronald Keith Bloomingkemper; and
- Ronald James Petrinovich.

*Id.* at 22-25.

44.     Royal Alliance has never had any direct or indirect ownership interest in United Securities, either before the asset purchase transaction or after it. In addition, prior to the transaction, Royal Alliance had no ownership interest in any assets of United Securities.

45.     None of the persons or entities listed in Paragraph 42 acquired any direct or indirect ownership interest in Royal Alliance or any of Royal Alliance's parents, subsidiaries, or affiliated companies as a result of the asset purchase transaction. Further, none of the persons listed in Paragraph 42 became an officer, director, or

9

1  employee of Royal Alliance.

2      46.  Royal Alliance is not a successor to United Securities for purposes of any

3  arbitration agreement or any liability not expressly and specifically assumed by the

4  terms of the Transfer Agreement.

5      47.  Despite the absence of an arbitration agreement or even any relationship

6  between Royal Alliance and the Defendant, despite the fact the Defendants is not a

7  customer of Royal Alliance, and despite the fact that Royal Alliance did not assume

8  United Securities' contractual obligations or litigation liabilities, the Defendant is

9  attempting to proceed with claims against Royal Alliance in an arbitration forum.

10      48.  Royal Alliance objects, and refuses to agree or voluntarily submit, to

11  arbitration of the Defendant's claims and expressly reserves all of its legal and

12  equitable rights, claims, remedies, and defenses against the Defendant, United

13  Securities, Clark, and any other potentially relevant person or entity.

14

15                          **FIRST CLAIM FOR RELIEF**
                          **(Declaratory Relief)**

16      49.  Royal Alliance hereby incorporates by reference the allegations

17  contained in the foregoing paragraphs.

18      50.  An actual controversy has now arisen between the Defendant and Royal

19  Alliance relating to the arbitrability of the Defendant's claims against Royal Alliance

20  in the Arbitration.  The Defendant contends that Royal Alliance is required to submit

21  to arbitration and to assert and litigate its defenses in the FINRA arbitration forum and

22  has commenced the Arbitration.  Royal Alliance, however, has never agreed, and,

23  therefore, is not required to arbitrate the Defendant's purported claims against it.

24  Royal Alliance seeks a declaration of the parties' respective rights and obligations

25  regarding this dispute.

26

27

28

## SECOND CLAIM FOR RELIEF
### (Preliminary and Permanent Injunctive Relief)

51.    Royal Alliance hereby incorporates by reference the allegations contained in the foregoing paragraphs.

52.    Royal Alliance seeks a preliminary and permanent injunction enjoining and restraining the Defendant and his agents from pursuing any claims against Royal Alliance in the Arbitration.

53.    Royal Alliance also seeks a permanent injunction requiring the Defendant to dismiss Royal Alliance from the Arbitration.

54.    Immediate and irreparable harm will result if relief is not granted because Royal Alliance will be forced to participate in the Arbitration in order to preserve its rights even though it has no arbitration obligation to the Defendant and has never agreed to arbitrate claims with the Defendant.  Royal Alliance has no adequate legal remedies to prevent this harm.

55.    Injunctive relief poses no appreciable risk of undue prejudice to the Defendant because it would not result in a holding as to liability and because the Defendant's remedies against others would still be viable, should the Defendant choose to pursue any such claims.


**WHEREFORE**, Royal Alliance demands as follows:

A.    That the Court declare that Royal Alliance is not obligated to submit to arbitration of the Defendant's claims against Royal Alliance;

B.    That the Defendant be preliminarily and permanently restrained and enjoined from pursuing his purported claims against Royal Alliance in the FINRA Dispute Resolution forum or in any other arbitration forum;

C.    That the Defendant be required to dismiss Royal Alliance from the Arbitration;

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

D.     That Royal Alliance be awarded the costs and expenses incurred herein; and

E.     That the Court grant such other and further relief as it deems just and proper.

Dated: April 12, 2011                    **ALSTON + BIRD LLP**

                                         _____
                                                   Michael J. Hartley
                                         Attorney for Plaintiff
                                         ROYAL ALLIANCE ASSOCIATES, INC.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# EXHIBIT A

11-00678
LA

## FINANCIAL INDUSTRY REGULATORY AUTHORITY

## FINRA CASE NO. _____

ERIC ANDERSON, an individual

                Claimant,

vs.

ROBERT J. CLARK, an individual; and
ROYAL ALLIANCE ASSOCIATES INC.,
a Delaware Corporation ,

                Respondents.

_____/

## STATEMENT OF CLAIM

## STATEMENT OF CLAIM

Claimant, Eric Anderson ("Claimant"), initiates this arbitration proceeding against Respondents Robert J. Clark ("Clark") and Royal Alliance Securities Inc. ("Royal Alliance") (collectively "Respondents"), and alleges as follows:

### Preliminary Statement

1.     This action is indirectly related to the action entitled *Securities and Exchange Commission v. Medical Capital Holdings, Inc., et al.*, Case No. SACV09-818 (DOC)("SEC action"), pending in the Central District of California. Pursuant to Section IX of the Court's Preliminary Injunction Order in the SEC action, Claimants have not included in this Statement of Claim claims against Medical Capital Holdings, Inc. ("MCH"), Medical Capital Corporation ("MCC"), its subsidiaries, and its affiliates (collectively referred to as "Medical Capital").

2.     This action arises from a massive breach of trust by Respondents, who were specifically charged with representing and protecting the interests of Claimant and other investors in Medical Capital notes.  In 2007, Respondents convinced Claimant to withdraw **all** of his assets in a diversified portfolio contained in his 401(k) retirement plan after he had retired in 2003 and place the **entirety** of his retirement fund assets into a single, non-diverse, unsuitable and extremely risky investment in Medical Capital notes.  Less than two years later, in 2009, Claimant had lost **all** of his retirement funds, was left destitute and was required to attempt to return to the workforce to survive.

## Parties and Related Persons

### Parties

3.     Claimant Eric Anderson is an individual and California resident.  He and various persons and entities purchased interests in notes issued by Medical Provider Funding Corporation II ("MP II"), Medical Provider Funding Corporation III ("MP III"), Medical Provider Funding Corporation IV ("MP IV"), Medical Provider Funding Corporation V ("MP V"), and Medical Provider Funding Corporation VI ("MP VI"). All of Claimant's investments were made in Series 1 notes issued by MP IV.

4.     Respondent Royal Alliance is and was at all relevant times a full-service broker-dealer with a national network of registered representatives and employees, offering a full range of investment products and services.  Royal Alliance is an SEC-registered investment advisor and broker- dealer registered with both the SEC and the Financial Industry Regulatory Authority ("FINRA"). The company was founded in 1988. Royal Alliance is headquartered in New York, New York.  At the relevant times, it also maintained an office in Carlsbad, California.  Respondent Royal Alliance completed a deal in approximately February 2007 to acquire United Securities Alliance, Inc. ("United Securities"). By and through this acquisition, which became effective in March 2007, Royal Alliance assumed all of United Securities' liabilities and is legally responsible to Claimant.

5.     Respondent Clark is and was at all relevant times a Financial Advisor offering securities and advisory services through his broker-dealer United

Securities as its agent and Registered Representative. According to the FINRA CRD, Clark was "employed" with United Securities from March 2004 to March 2007. Clark operated from his office in Carlsbad, California. Because United Securities was acquired by Respondent Royal Alliance, Respondent Clark was an agent of Respondent Royal Alliance.

## Non-Parties

6.      Claimants are aware of various non-parties that participated in the wrongdoing alleged herein. Many of these persons and entities, including some described below, have been named in the SEC's related complaint and/or included in the Court's Permanent Injunction Order which presently precludes noteholder investors from bringing legal claims against designated parties, including affiliates of MCH and MCC.

7.      MCH was a Nevada corporation with its principle place of business in Tustin, California. Through various wholly owned operating subsidiaries and Special Purpose Corporations ("SPCs"), MCH provided financing to healthcare providers by purchasing their accounts receivables and making secured loans to them. MCH used the SPCs to raise money from investors to fund the financing. MCH used the operating subsidiaries to underwrite, monitor, administer, and service these financings. In February 2001, the California Department of Corporations issued a Desist and Refrain Order against MCH from the further offer or sale of securities in the State of California. The Respondents never informed Claimant of this material information.

8.     MCC is a Nevada corporation and wholly owned subsidiary of MCH, with its principal place of business in Tustin, California. MCC is the administrator for each of MCH's SPCs, including MP II, III, IV, V and VI, and provides management, underwriting, and administrative services, such as bookkeeping, payroll, and accounting services, including administration of all investor promissory notes and interest payments. The directors of MCC are Sidney Field and Joseph Lampariello, as well as Lawrence J. Edwards. Field serves as MCC's CEO and Lampariello serves as MCC's President and COO. Other key employees of MCC include Alan Meister (Treasure and Chief Financial Officer) and Thomas Fazio (General Counsel). MCC's primary source of revenue was the Administrative Fees paid through various SPCs.

9.     MP IV is a Nevada corporation and wholly-owned SPC of MCH that was formed in July 2005 and commenced operations in October 2006. From November 2006 through February 2008, MP IV conducted two series of note offerings, raising a total of $401.3 million by issuing 4,222 notes to investors. As of May 2009, MP IV had $400 million in outstanding notes and defaulted in interest payments in January 2009 and since March 2009.

## Facts Common to All Claims

### MCH's Business

10.     Since 2003, MCH raised over $2.2 billion from investors, including Claimants and other Class members, supposedly to fund its operations. The money was raised through the offering of notes issued by five SPCs created by MCH: MP II, MP III, MP IV, MP V, and MP VI.

11.    Investors received a Private Placement Memorandum ("PPM") for each SPC, which represented that investor funds within each SPC would be carefully segregated and used to pay for accounts receivable from medical providers. Investors were further assured that their funds would not be used to pay administrative fees to MCH and its affiliates.

12.    On August 3, 2009, a Receiver was appointed to marshal and preserve assets and to pursue claims to recover and preserve funds, assets and property of the Medical Capital entities in a proceeding now pending in the Central District of California (Santa Ana division)("Receivership"), Case No. SACV 09-818 DOC (RNBx).  The Receiver makes periodic reports to the Court.  As now revealed in the SEC action, in reports issued by the Receiver, MCH, MCC, Fields and Lampariello – for years – used the accounts as their personal piggy banks, improperly requesting and obtaining investor funds to pay themselves massive "administrative fees" of nearly $325 million which they used to purchase lavish personal perquisites, as described in more detail below. MCH and its affiliates also invested in an array of non-medical projects that were placed under the personal supervision of Lampariello, including mobile phone and movie ventures, and commingled investor funds between the various SPCs, all in violation of the PPMs issued to investors. Despite controlling hundreds of millions of dollars, the SEC and Receiver further found that the Medical Capital entities operated without financial or accounting controls, failed to prepare financial statements in accordance with GAAP, failed to use audited financial statements, failed to perform annual appraisals of assets, and repeatedly obtained the Trustees' permission to pay themselves fees based on a formula that blatantly violated the PPMs' mandate that fees not come from investor funds.

13.    All five SPCs are now in default to investors, failing to make interest and principle payments on almost $1 billion worth of notes. Based on his review of internal records, and interviews with company employees, the Receiver recently reported to the Court that of approximately $625 million of medical accounts receivable on the SPCs' collective books, just $80 million is verifiable, and the remaining accounts – totaling $542 million – "no longer exist."

14.    The SPCs sold notes with various maturities (one to seven years) and interest rates (8.5% to 10.5%). The PPMs described the terms of the notes, the nature of and limitations on the loans and investments that will be made with the proceeds, and the policies and procedures for the payment of fees. Importantly, the SPCs represented that after paying offering expenses of 4% to 8%, they would use the net offering proceeds to purchase healthcare receivables and make investments in other related business. The broker-dealers and the registered representatives (such as Respondents) selling these investments made extraordinarily high commissions of about 7% on the sale of these investments. Therefore, they had a very significant motivation to place investors into these investments over much safer and more suitable investments because of this commission structure.

**Overpayment of Administrative Fees and Inflated Collateral Valuations**

15.    As described in the SEC complaint in the SEC action, while MCC was entitled to a fee for its services, the PPMs highlighted, under the heading "Restrictions on Use of Proceeds," that the SPCs would not use "any proceeds from the sales of notes to pay administrative fees to [MCC] for the services it provides as administrator" and that such fees would rather be "paid out of amounts collected from the accounts receivables and proceeds from other investments." The

PPMs further represented that the SPCs believed that the administrative fees paid to MCC would be "no greater than those an independent third-party would charge for providing similar services."

16.     MCH and MCC did not use offering proceeds as represented in the PPMs and, instead, misappropriated a substantial amount of the investors' funds to pay administrative fees to MCC. Indeed, according to the SEC's complaint, as of June 19, 2009, MP VI's administrative fees exceeded its collections by approximately $18.5 million in direct contravention to its PPMs' representations that administrative fees would solely be "paid out of amounts collected from the accounts receivable and proceeds from other investments."

17.     After the Receiver was appointed, he traveled to the MCC premises in Tustin, secured the premises and called meeting of all MCC employees. The Receiver and his counsel then took several steps to investigate and secure the assets of the SPCs, including (1) interviewing former MCC employees and counsel regarding the operations and assets of the SPCs, pending litigation and transactions, and the flow of funds into and out of the companies; and (2) locating and reviewing company documents pertaining to key non-receivable assets, pending litigation and various transactions.

18.     As a result of his investigation, the Receiver has filed reports with the Court, including a Second Report recently filed on September 8, 2009, which confirm many of the SEC's original allegations regarding MP IV.

19.     According to the Receiver's Reports and the SEC Complaint: (1) five of the six SPCs (including MP IV) were in default or late in paying principal

and/or interest on $992.5 million in Notes since August 2008; (2) Medical Capital and its executives misappropriated more than $300 million of investor funds through the improper payment of purported administrative fees; (3) MP II - VI were never profitable and resulted in substantial cash outflows from each SPC and losses totaling in excess of $316 million; (4) $617 million of the $625 million of accounts receivables on the books of the SPCs at the time the Receiver assumed control of Medical Capital either no longer existed or were too old to be collectible; and (5) loans and other assets with a claimed value of almost $1 billion were transferred between and among the SPCs for the purpose of paying improper administrative fees and paying earlier investors from new investors' funds.

20.    According to the Receiver, MCC collected Administrator Fees in MP IV in the amount of $56,565,000.

21.    The Receiver further prepared a breakdown of the Administrative Fees paid by year, revealing that the vast majority of fees in MP IV were paid at the beginning of its existence and well before significant medical accounts receivables had been collected by it.

22.    The SEC Complaint and Receiver's Reports describe inflated and unreliable collateral valuations in Medical Capital collateral reports. For example, a collateral report for MP IV had an asset listed as related to the "Legacy Medical Center" in Georgia valued at $40 million. The facility in question was foreclosed and non-operational. Investors such as Claimant purchased vastly over-valued and sometimes non-existent receivables.

23.     Because administrative fees paid to MCC were based on net collateral coverage ratio ("NCCR") reported in the collateral reports, and because the collateral reports contained inflated and unreliable collateral valuations of Medical Capital assets, the administrative fees paid to MCC were improper.

**Non-Medical and Non-Performing Investments**

24.     The PPMs also stated that note proceeds would be used to purchase account receivables, make secured loans, pay sales commissions and other operating costs, provide funds for general operating purposes, and pay principal and interest on the notes. However, according to the SEC Complaint and Receiver's Reports, MCH and MCC improperly made a number of undisclosed investments unrelated to the healthcare field, including:

a.     $6.9 million investment in Vivavision, Inc. - whose primary business is marketing content for mobile phone applications;

b.     An investment in Single Touch Initiative, another company that provided mobile phone applications, for about $5.4 million;

c.     An investment in EMark Advertising Inc., an internet advertising company for $17.2 million that purportedly specialized in "pornographic website advertising";

d.     Ownership of a 118-foot yacht, called "Home Stretch," moored in Newport Beach, California, which purportedly was used by Lampariello and other Medical Capital executives for private parties; and

e.     $20 million investment in an unknown, unreleased film, "The Perfect Game."

25.     Respondents were aware that an outside due-diligence analyst hired by Medical Capital warned both Medical Capital and broker-dealers such as Royal Alliance that the Medical Capital Noteholders should be told more about the risks of their investments. Indeed, in an email addressed to Medical Capital from the outside due diligence analyst expressing his dismay with Medical Capital's responses to the client disclosure form relating to the MP IV notes, the analyst stated:

> "Fred, I disagree with every point and nothing in MCP IV has changed structurally. It is very unfortunate that you have the ability to enhance this offering but see fit to peel off cash every month. For $250 million if BNY wants to do nothing in its capacity that doesn't prevent you from appointing an independent audit person or firm to actually accomplish oversight for investors. Nothing similarly prohibits you from leaving some of the cash in a sinking fund to provide extra measure of security. Joey told me last time that either he or Sid would personally certify the CCR at 1:1 or better every month: I even drafted a certification to use, which was never implemented. I could go on and on but if you guys figure 'the money keeps rolling in, why not do anything?' then that's certainly your business decision."

26.     Royal Alliance was aware of this report but decided not to share the analyst's concerns with investors such as Claimant and actively took steps to prevent such disclosure because it was more concerned with profiting from the very large commissions it earned from Medical Capital investment sales than it was with its legal and fiduciary duties owed to its customers.